UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- x
                                                                     :
STEFAN WATHNE, THORUNN WATHNE,                  08 CV 00420 (GEL)
BERGJLOT WATHNE, SOFFIA WATHNE and             :
WATHNE, LTD.
                                                                     :  **AFFIDAVIT OF ESTHER**
                                   Plaintiffs,                        **MALAMUD IN**
                                                                     :  **OPPOSITION TO**
                  v.                                                     **MOTION OF**
                                                                     :  **DEFENDANT VALERIE**
VALERIE SAROFIM,                                                         **SAROFIM TO DISMISS**
                                                                     :  **THE COMPLAINT**
                                   Defendant.
                                                                     :
------------------------------------------------------------------- x

STATE OF NEW YORK    )
                     ) ss.
COUNTY OF NEW YORK   )

        ESTHER MALAMUD, being duly sworn, deposes and says:

        1.     I am the chief financial officer of plaintiff Wathne Ltd., a corporation owned by

plaintiffs Bergjlot Wathne, Soffia Wathne and Thorunn Wathne (the "Wathnes"). I submit this

affidavit in opposition to the motion of defendant Valerie Sarofim to dismiss the Complaint. A

copy of the Complaint is annexed hereto as Exh. A. Ms. Sarofim's Answer and Amended

Answer are annexed hereto as Exhs. B and C, respectively.

        2.     In late September 2007, the Wathnes learned that Thorunn's son, plaintiff Stefan

Wathne, had been indicted on a one-count indictment out of the Northern District of California

for alleged conspiracy to launder money in Russia during the period from 1997 – 2000, allegedly

for the benefit of a person who had been convicted of conspiracy to manufacture and sell LSD.

        3.     On or about October 8, 2007, Bergjlot Wathne received a letter from Robb Todd,

Esq., who, in identifying himself as Valerie Sarofim's attorney, claimed that his client had

allegedly made a $150,000 investment in Russian real estate through Stefan. A copy of Mr. Todd's October 8, 2007 letter is annexed hereto as Exh. D. Mr. Todd stated that Ms. Sarofim "has recently discovered that this [$150,000] investment may have, in fact, been a sham investment...", threatening to file suit if the matter was not resolved within thirty days. *Id.*

4.    I knew Valerie Sarofim's name because I handle some of the Wathnes' personal financial matters and I recalled that Ms. Sarofim had invested in a building on West 43rd Street in Manhattan in 2002, at which time she wired the investment funds to a New York account of the Wathnes.

5.    I telephoned Robb Todd to discuss this matter. I reminded him that Valerie Sarofim's money had been invested in New York City real estate, yet Mr. Todd still claimed that Ms. Sarofim was the victim of a money laundering scheme in which her money was invested in Russia.

6.    On October 16, 2007, I received the following email from Robb Todd:

FYI, the following is a cut-and-pasted copy of the article in the Indian Express concerning Mr. Wathne which alerted my client that her money was likely procured as part of an investment sham. As I mentioned today, my client met the Wathne family through family connections and just wants to be made whole ($150,000.00, plus interest and legal fees).

*See* Exhibit E.

7.    I thereafter spoke to the Wathnes who directed me to repay to Valerie her entire investment with interest, which I reported to Mr. Todd.

8.    On October 23, 2007, Mr. Todd e-mailed me at my New York office, requesting that Sarofim receive $150,000.00, plus six percent (6%) interest. *See* Exh. F. Mr. Todd further stated that:

2

> My client remains very concerned that her money was used
> without her knowledge as part of a drug related money laundering
> operation.

*Id.* Todd also insisted that Wathne also pay a legal fee of $21,077.05 which Wathne believed

was outrageous given their willingness to return all of Ms. Sarofim's investment with interest

immediately upon her request, despite the fact that the real estate investment was illiquid and had

not yet generated a return. *Id.*

9.      On October 24, 2007, Mr. Todd transmitted to me, by fax to my New York office,

a Release, signed by Valerie Sarofim, which required Wathne to pay Ms. Sarofim $209,783.81,

and to make a payment to Mr. Todd in the amount of $10,489.19, half of his original demand.

*See* Exh. G.

10.     Two days later, on October 26, 2007, I arranged for a wire transfer from a bank in

New York to Sarofim of $209,783.81, which payment was subsequently acknowledged by Mr.

Todd.  Wathne did not pay Mr. Todd the additional $10,489.19 for legal fees because Wathne

believed that Todd was engaging in extortion.

11.     Valerie Sarofim retained the $209,783.81 and did not object to Wathne's decision

not to pay Robb Todd the additional $10,489.19 he demanded.  In fact, I heard nothing further

from Ms. Sarofim or Mr. Todd until January 11, 2008, when Mr. Todd faxed to my New York

office a letter threatening to file an annexed complaint by 5:00 CDT on January 15, 2008 "if we

are unable to resolve this matter as anticipated."[1] *See* Exh. H.  "Resolution of this matter"

according to Mr. Todd, "require[d] that…[Sarofim] be compensated for all actual damages,

interest and legal fees and an amount approximating your exposure for punitive damages." *Id.*

"Actual damages" in Todd's opinion, "include[s] my clients 'benefit of the bargain' which

---

[1] The draft complaint, which was to be filed in Texas, named as defendants Stefan Wathne and a non-existent entity,

1039063.1

warrants an award equal to that which she was promised. This equates to a doubling or tripling of my client's initial investment (per quarter) from the date of her wire through the present date." *Id.*

12.     The enclosed draft complaint was against Stefan Wathne and the Wathne Corporation. As alleged in the complaint, the basis for suing the Wathne Corporation is that Ms. Sarofim received wire transfer instructions in January 2002 on Wathne Corporation letterhead. *See* Exh. H, draft Complaint ¶ 6.

13.     In fact, the wire transfer instructions were not sent on Wathne Corporation letter head. The fax cover page refers simply to "Wathne." See Exh. A to the draft complaint, annexed as Exh. H.

14.     On January 16, 2008, I contacted Robb Todd, who spoke in a very confusing manner about Sarofim contacting the United States Attorney to discuss Stefan Wathne's alleged money laundering. I felt very uncomfortable with Mr. Todd's statements and, consequently, asked the Wathnes' attorney, Helen Davis Chaitman, Esq., to call him back.

Esther Malamud

Sworn to before me this
1   day of April, 2008

Notary Public

MARC B. ZIMMERMAN
NOTARY PUBLIC, State of New York
No. 02ZI5042154
Qualified in Queens County
Commission Expires April 17, 2011

4

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 08 CV 00420

--------------------------------------------------------x
:
STEFAN WATHNE, THORUNN WATHNE, .
BERGJLOT WATHNE, SOFFIA WATHNE and
WATHNE, LTD.                                                    Civ.

                                        Plaintiffs,

            v.

VALERIE SAROFIM and ROBB TODD,

                                        Defendants.

--------------------------------------------------------x




COMPLAINT

JAN 16 2003

U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiffs, Stefan Wathne, Thorunn Wathne, Bergjlot Wathne, Soffia Wathne and

Wathne, Ltd. (collectively, "Plaintiffs"), by their attorneys, Phillips Nizer LLP, for their

Complaint, state as follows:

## JURISDICTION AND VENUE

1.      This is a civil action for declaratory relief brought pursuant to the Declaratory

Judgment Act, 28 U.S.C. §§ 2201 and 2202.

2.      The Court has subject matter jurisdiction of this action pursuant to 28 U.S.C.

§ 1332.

3.      The amount in controversy in this matter is in excess of $75,000.00.

4.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial

part of the events giving rise to Plaintiffs' claim occurred in this district.

## THE PARTIES

5.      Plaintiff Stefan Wathne is a citizen of Iceland, who resides at 150 Central Park

South, New York, NY 10019.

1031063.1

6.    Plaintiff Thorunn Wathne is a citizen of the United States who resides at 150 Central Park South, New York, NY 10019.

7.    Plaintiff Bergjlot Wathne is a citizen of Iceland, who resides at 150 Central Park South, New York, NY 10019.

8.    Plaintiff Soffia Wathne is a citizen of the United States who resides at 150 Central Park South, New York, NY 10019.

9.    Plaintiff Wathne, Ltd. is a company duly organized and operating under the laws of the State of New York with its principal place of business at 156 West 56th Street, New York, NY 10019.

10.    Upon information and belief, Defendant Valerie Sarofim ("Sarofim") resides at 1302 Waugh, Suite 137, Houston, Texas 77019.

11.    Upon information and belief, Defendant Robb Todd ("Todd") resides at 4265 San Felipe, Suite 605, Houston, TX 77027.

## FIRST COUNT AS AGAINST ALL DEFENDANTS

### (Declaratory Relief)

12.    Plaintiffs repeat, reiterate and reallege the allegations contained in paragraphs 1 through 11 hereof with the same force and effect as have fully set forth herein.

13.    Upon information and belief, Todd is an attorney who practices law in Houston, Texas.

14.    In or about October 2007, Todd contacted Plaintiffs, on Sarofim's behalf, claiming the Sarofim had invested $150,000.00 in a real estate project and had received no return on her money.

15.    After subsequent discussions between the parties, Plaintiffs agreed to return to Sarofim the $150,000.00 that she had purportedly invested, together with six percent interest on

2

that amount, for a total of $209,783.81 in resolution of the issue. Plaintiffs subsequently wired $209,783.81 to an account identified by Todd.

16.     In consideration for Plaintiffs' payment, and in apparent resolution of the matter, Sarofim executed a release in favor of the Plaintiffs.

17.     Defendants have recently taken the position that the release is a nullity, that the debt is still owed, and that they are entitled to commence a lawsuit against Plaintiffs arising out of the investment. Accordingly, a controversy now exists as to whether Defendants are barred by the release from commencing a lawsuit against Plaintiffs.

18.     The declaratory judgment sought by this action will settle directly, expeditiously and finally the controversy concerning the impact of the release.

19.     Plaintiffs have no adequate remedy at law.

WHEREFORE, Plaintiffs seek judgment against Defendants declaring that the release executed by Sarofim is in full force and effect and bars her from commencing an action against Plaintiffs arising out of the subject real estate investment.

Dated: New York, New York
January 16, 2008

PHILLIPS NIZER LLP

By: _____
        Bruce J. Turkle (BT-2676)
Attorneys for Plaintiffs
666 Fifth Avenue
New York, New York  10103-0084
(212) 977-9700

3

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
STEFAN WATHNE, THORUNN WATHNE,
BERGJLOT WATHNE, SOFFIA WATHNE, and
WATHNE, LTD.,

                    Plaintiffs,

      v,

VALERIE SAROFIM and ROB TODD,

                    Defendants.
-----------------------------------------------------------------X

08 CV 00420 (GEL)

ANSWER OF
VALERIE SAROFIM

Defendant Valerie Sarofim, by her attorneys, Mound Cotton Wollan & Greengrass, hereby answers the Complaint of Stefan Wathne, Thorunn Wathne, Bergjlot Wathne, Soffia Wathne, and Wathne, Ltd. (collectively, "Plaintiffs") as follows:

### JURISDICTION AND VENUE

1.    Defendant states that the allegations set forth in paragraph 1 of the Complaint constitute a statement concerning the nature of this action to which no response is required, but to the extent a response is required, Defendant admits that Plaintiffs seek declaratory relief, but she denies that Plaintiffs are entitled to such relief.

2.    Defendant states that the allegations set forth in paragraph 2 of the Complaint are legal conclusions to which no response is required, but to the extent a response is required, Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 2.

3.    Defendant states that the allegations set forth in paragraph 3 of the Complaint are legal conclusions to which no response is required, but to the extent a response is required, Defendant denies that the amount in controversy exceeds $75,000.

4.     Defendant states that the allegations set forth in paragraph 4 of the Complaint are legal conclusions to which no response is required, but to the extent a response is required, Defendant denies that venue is proper in this District.

## THE PARTIES

5.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 5 of the Complaint.

6.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 6 of the Complaint.

7.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 7of the Complaint.

8.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 8 of the Complaint.

9.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 9 of the Complaint.

10.     Defendant denies the allegations set forth in paragraph 10 of the Complaint, except that she admits that she is a citizen of Texas, residing in Houston.

11.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 11 of the Complaint.

## FIRST COUNT AGAINST ALL DEFENDANTS

### (Declaratory Relief)

12.     Defendant repeats, reiterates, and incorporates by reference her responses to each and every allegation set forth in paragraphs 1 through 11 of the Complaint.

13.     Defendant admits the allegations set forth in paragraph 13 of the Complaint.

2

14.    Defendant denies the allegations set forth in paragraph 14 of the Complaint as pleaded.

15.    Defendant denies the allegations set forth in paragraph 15 of the Complaint, except that Defendant admits that the sum of $209,783.81 was wired to her account.

16.    Defendant denies the allegations set forth in paragraph 16 of the Complaint as pleaded, except that Defendant admits that she executed a release, and avers that the amount paid to her was insufficient.

17.    Defendant denies the allegations set forth in paragraph 17 of the Complaint, except that Defendant admits that the release is a nullity, admits that monies are still owed to her, and admits that she is entitled to commence a lawsuit arising from the investment.

18.    Defendant denies the allegations set forth in paragraph 18 of the Complaint.

19.    Defendant states that the allegations set forth in paragraph 19 of the Complaint are legal conclusions to which no response is required, but to the extent that a response is required, Defendant denies the allegations set forth in paragraph 19 of the Complaint.

## FIRST DEFENSE

20.    The Complaint fails to state a claim upon which relief can granted.

## SECOND DEFENSE

21.    Plaintiffs' claims are barred by the doctrines of waiver and estoppel.

## THIRD DEFENSE

22.    Plaintiffs' claims are barred by fraud.

## FOURTH DEFENSE

23.    Plaintiffs' claims are barred by the doctrine of unclean hands.

### FIFTH DEFENSE

24.    Venue is not proper in this District.

**WHEREFORE,** Defendant respectfully requests judgment in its favor as follows:

(A)    Dismissing all claims against it with prejudice; and

(B)    Awarding her costs, disbursements, reasonable attorneys' fees and such other and

further relief as this Court deems just and proper.

### JURY TRIAL DEMANDED

Defendant demands a trial by jury.

Dated: New York, New York
       March 3, 2008

MOUND COTTON WOLLAN & GREENGRASS

By:    s/Sanjit Shah
       Jeffrey S. Weinstein (JW-2619)
       Sanjit Shah (SS-0148)
       One Battery Park Plaza
       New York, New York 10004
       Phone : (212) 804-4200
       Fax    :(212) 344-8066
       jweinstein@moundcotton.com
       sshah@moundcotton.com
       *Attorneys for Defendant*
       *Valerie Sarofim*

4

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
STEFAN WATHNE, THORUNN WATHNE,
BERGJLOT WATHNE, SOFFIA WATHNE, and
WATHNE, LTD.,

                                                08 CV 00420 (GEL)

                    Plaintiffs,

          v.

VALERIE SAROFIM and ROB TODD,

                    Defendants.
----------------------------------------------------------------------X

## CERTIFICATE OF SERVICE

          I hereby certify that true and correct copies of the Answer of Valerie Sarofim and Notice
of Appearance of Sanjit Shah were served by United States mail, postage pre-paid, on the 3rd
day of March 2008 upon those persons or entities listed below.

Bruce J. Turkle, Esq.
Phillips Nizer LLP
666 Fifth Avenue
New York, NY 10103-0084
*Attorneys for Plaintiffs*

                                        /s/ Sanjit Shah
                                        Sanjit Shah (SS-0148)

# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
STEFAN WATHNE, THORUNN WATHNE,
BERGJLOT WATHNE, SOFFIA WATHNE, and
WATHNE, LTD.,

                Plaintiffs,

                            08 CV 00420 (GEL)

      v.
                            AMENDED ANSWER
                            OF VALERIE SAROFIM

VALERIE SAROFIM and ROB TODD,

                Defendants.
-------------------------------------------------------------------X

       Defendant Valerie Sarofim, by her attorneys, Mound Cotton Wollan & Greengrass, hereby answers the Complaint of Stefan Wathne, Thorunn Wathne, Bergjlot Wathne, Soffia Wathne, and Wathne, Ltd. (collectively, "Plaintiffs") as follows:

## JURISDICTION AND VENUE

       1.    Defendant states that the allegations set forth in paragraph 1 of the Complaint constitute a statement concerning the nature of this action to which no response is required, but to the extent a response is required, Defendant admits that Plaintiffs seek declaratory relief, but she denies that Plaintiffs are entitled to such relief.

       2.    Defendant states that the allegations set forth in paragraph 2 of the Complaint are legal conclusions to which no response is required, but to the extent a response is required, Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 2.

       3.    Defendant states that the allegations set forth in paragraph 3 of the Complaint are legal conclusions to which no response is required, but to the extent a response is required, Defendant denies that the amount in controversy exceeds $75,000.

4.    Defendant states that the allegations set forth in paragraph 4 of the Complaint are legal conclusions to which no response is required, but to the extent a response is required, Defendant denies that venue is proper in this District.

## THE PARTIES

5.    Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 5 of the Complaint.

6.    Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 6 of the Complaint.

7.    Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 7of the Complaint.

8.    Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 8 of the Complaint.

9.    Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 9 of the Complaint.

10.    Defendant denies the allegations set forth in paragraph 10 of the Complaint, except that she admits that she is a citizen of Texas, residing in Houston.

11.    Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 11 of the Complaint.

## FIRST COUNT AGAINST ALL DEFENDANTS

### (Declaratory Relief)

12.    Defendant repeats, reiterates, and incorporates by reference her responses to each and every allegation set forth in paragraphs 1 through 11 of the Complaint.

13.    Defendant admits the allegations set forth in paragraph 13 of the Complaint.

2

14.    Defendant denies the allegations set forth in paragraph 14 of the Complaint as pleaded.

15.    Defendant denies the allegations set forth in paragraph 15 of the Complaint, except that Defendant admits that the sum of $209,783.81 was wired to her account.

16.    Defendant denies the allegations set forth in paragraph 16 of the Complaint as pleaded, except that Defendant admits that she executed a release, and avers that the amount paid to her was insufficient.

17.    Defendant denies the allegations set forth in paragraph 17 of the Complaint, except that Defendant admits that the release is a nullity, admits that monies are still owed to her, and admits that she is entitled to commence a lawsuit arising from the investment.

18.    Defendant denies the allegations set forth in paragraph 18 of the Complaint.

19.    Defendant states that the allegations set forth in paragraph 19 of the Complaint are legal conclusions to which no response is required, but to the extent that a response is required, Defendant denies the allegations set forth in paragraph 19 of the Complaint.

## FIRST DEFENSE

20.    The Complaint fails to state a claim upon which relief can granted.

## SECOND DEFENSE

21.    Plaintiffs' claims are barred by the doctrines of waiver and estoppel.

## THIRD DEFENSE

22.    Plaintiffs' claims are barred by fraud.

## FOURTH DEFENSE

23.    Plaintiffs' claims are barred by the doctrine of unclean hands.

3

## FIFTH DEFENSE

24.   Venue is not proper in this District.

## SIXTH DEFENSE

25.   This Court lacks jurisdiction over the person of Defendant Sarofim.

**WHEREFORE,** Defendant respectfully requests judgment in its favor as follows:

    (A)   Dismissing all claims against it with prejudice; and

    (B)   Awarding her costs, disbursements, reasonable attorneys' fees and such other and

further relief as this Court deems just and proper.

## JURY TRIAL DEMANDED

Defendant demands a trial by jury.

Dated: New York, New York
      March 13, 2008

                 MOUND COTTON WOLLAN & GREENGRASS

                 By:   s/Sanjit Shah
                       Jeffrey S. Weinstein (JW-2619)
                       Sanjit Shah (SS-0148)
                 One Battery Park Plaza
                 New York, New York 10004
                 Phone : (212) 804-4200
                 Fax   :(212) 344-8066
                 jweinstein@moundcotton.com
                 sshah@moundcotton.com
                 *Attorneys for Defendant*
                 *Valerie Sarofim*

# EXHIBIT D

**ROB TODD**
ATTORNEY AT LAW
TODD LAW FIRM
*4265 San Felipe, Suite 605 • Houston, Texas 77027*
*(713) 439.0039 • Fax (713) 629.1553*
*robtodd@usa.net*

October 8, 2007                    VIA CMRRR NO.70051820000448397363

Mr. Wayne Bergljot,
Chief Executive Officer
Wathne Corporation
156 W. 56th St.
New York, NY 10019

## RE: AMOUNT'S OWED TO VALERIE SAROFIM

Dear Mr. Bergljot:

I have been retained by Ms. Valerie Sarofim with regard to amounts she payed to the Wathne Corporation and that remain unpaid and unaccounted for. Please note the following:

On information and belief, at your company's request, my client wired the sum of $150,000.00 to the Wathne Corp, care of Thoruna Borge and Sofia Wathne on or about January 28, 2002. This wire transfer was made pursuant to an agreement by Mr. Stefan Wathne and the Wathne Corporation to invest said money in Russian real estate interests. My client has been regularly reassured since the beginning that the investments were prosperous, but to date has received no accounting or other indicia of the success or failure of said investment. My client has recently discovered that this investment may have, in fact, been a sham investment made under the apparent authority of the Wathne Corp. I have attached a memo from Wathne Corporation with wiring instructions, and my client's memo to her bank authorizing the wire and confirming her understanding that the transfer was to be made to the "Wathne Corporation".

Please consider this letter my client's formal demand for an accounting of said funds. Additionally, please also consider this my client's formal demand for return of said funds, plus interest and legal fees and expenses. Please also be advised that should it appear that the wire transfer was requested as part of a fraudulent transaction, that my client may have additional remedies available.

It bears noting that a quick review of the Texas Secretary of State records indicates that the Wathne Corporation has never registered to do business in the State of Texas, although it, in fact, did so in participating in this transaction. Accordingly, the corporate veil does not exist and all shareholders are potentially liable jointly and severally on a partnership basis.

LETTER TO BERGLJOT WATHNE
OCTOBER 8, 2007
PAGE 2

My client has authorized me to file suit should this matter not be resolved to her satisfaction within the next thirty days.  Please call me to discuss at your earliest convenience, and to provide me with your position on this matter.

Regards,

Rob Todd

cc:    Valerie Sarofim

OCT. 4. 2007  2:47PM   CAMPBELL HARRISON                    NO. 100   P. 3

Dear Vicki,

As per our discussion
this is to confirm that
I want $150,000 transjered
from my core account
to the Wathne Corp.
Acct # 114-640742.
Thank you and have a nice
weekend.

Valerie Sepien

TGW 183

Wathne                    1/ '/02 11:02  PAGE  1/1   Rig' 'FAX         Vc

## Wathne

# *Facsimile*

To:        Vickie Sari
@Fax.      213 244-0546
From:      Tom Ferrie
Date:      Monday, January 28, 2002 @ 10:04AM
Re:        Wire info for Stefan Wathne
Pages:     1. including this

To follow are the wire instructions for the transfer from Valarie Serafina to Stefan Wathne:

        Bank of New York
        ABA #: 021000018
        Account title: Berge, Thorunn. Soffia Wathne
        Account #: 0957304666

Please call me at (212) 707 9797 to confirm that the wire has been completed. I apologize

**TCW 190**

| sarafim loan | initial invest | interest rate | | |
|---|---|---|---|---|
| made 1/28/2002 | 150,000 | 0.06 | 8250 | 11 month 20 |
| Yr 2003 | 158,250 | | 9495 | |
| Yr 2004 | 167,745 | | 10,065 | |
| Yr 2005 | 177,810 | | 10,669 | |
| Yr 2006 | 188,478 | | 11,309 | |
| Yr 2007 | 199,787 | | 9,989 | 10 months 2 |
| | **209,776** | | | |

Interest rate:    6.00%

|  | Beginning | interest earned | ending |
|---|---|---|---|
| 1/28/2002 | $ 150,000.00 | | $ 150,000.00 |
| 12/31/2002 | 150,000.00 | 8,309.59 | 158,309.59 |
| 12/31/2003 | 158,309.59 | 9,498.58 | 167,808.16 |
| 12/31/2004 | 167,808.16 | 10,096.07 | 177,904.24 |
| 12/31/2005 | 177,904.24 | 10,674.25 | 188,578.49 |
| 12/31/2006 | 188,578.49 | 11,314.71 | 199,893.20 |
| 10/28/2007 | $ 199,893.20 | 9,890.61 | $ 209,783.81 |

# EXHIBIT E

**Esther Malamud**

| | |
|---|---|
| From: | Esther Malamud |
| Sent: | Tuesday, October 16, 2007 2:19 PM |
| To: | 'robtodd@usa.net' |
| Subject: | Re: STEFAN WATHNE |

I will call you tomorrow after I try to speak to them

----- Original Message -----
From: Rob Todd <robtodd@usa.net>
To: Esther Malamud
Sent: Tue Oct 16 14:08:38 2007
Subject: STEFAN WATHNE

Esther--

FYI, the following is a cut-and-pasted copy of the article in the Indian Express
concerning Mr. Wathne which alerted my client that her money was likely procured as part
of an investment sham. As I mentioned today, my client met the Wathne family through
family connections and just wants to be made whole ($150,000.00, plus interest and legal
fees).

 <http://www.expressindia.com/>  Tue, 16 Oct 2007 - Weather
<http://www.expressindia.com/latest-news/wanted-for-money-laundering-in-US-Iceland-man-
held-at-IGI/221561/weatherReport.php>  | Horoscope <http://astro.expressindia.com/>  |
Stocks <http://financialexpress.com/stocks.php>

      expressindia            web
 <http://static.expressindia.com/expressindia/images/goog_logo.gif>

Home <http://www.expressindia.com/> Blogs <http://www.expressindia.com/blogs> Cricket
<http://cricket.expressindia.com/> Astrology <http://astro.expressindia.com/> Shopping
<http://shopping.expressindia.com/> Travel <http://travel.expressindia.com/> Tenders
<http://tenders.expressindia.com/> Classifieds <http://www.expressclassifieds.in/beta/>
Estates <http://expressestates.in/> Opinions <http://www.expressindia.com/eicomments.php>
Login <http://www.expressindia.com/login.php>
 | Make this your homepage
 | <http://www.expressindia.com/latest-news/wanted-for-money-laundering-i
 | n-US-Iceland-man-held-at-IGI/221561/#>  | Feedback
 | <http://www.expressindia.com/feedback.php>
Font Size –          <javascript:decreaseFontSize();>    <javascript:increaseFontSize();>
Expressindia <http://www.expressindia.com/latest-news/wanted-for-money-laundering-in-US-
Iceland-man-held-at-IGI/221561/#>  » Story
<http://static.expressindia.com/expressindia/images/zero.gif>

Wanted for money laundering in US, Iceland man held at IGI

Amandeep Shukla

Posted online: Thursday , September 27, 2007 at 12:00:00
Updated: Thursday , September 27, 2007 at 12:13:07 Print
<http://www.indianexpress.com/printerFriendly/221561.html> Email
<http://www.expressindia.com/latest-news/wanted-for-money-laundering-in-US-Iceland-man-
held-at-IGI/221561/#> To Editor <http://www.expressindia.com/feedback.php>

New Delhi, September 26 An Iceland national wanted for the past at least four years by the
United States for money laundering has landed in the Delhi Police's net at the Indira
Gandhi International Airport.

1

Gunnar Stefan Moller, also known as Wathe Stefan, carries a "red corner notice" issued by US investigative agencies for evading arrest and escaping the country. The IGIA police arrested him on Friday.

Police sources said a US district court in North Carolina had issued a warrant against Moller in September 15, 2005.

Sources said charges against Moller date back to April 1, 2003, when a US court in Kansas convicted one William Pikard for manufacturing banned LSD drug (Lysergic Acid Diethylamide). According to US authorities, Moller helped Pikard launder his ill-gotten money by investing it in Russia. US authorities estimate Moller had laundered as much as US$ 3 million for Pikard in Russia.

Newsline has learnt the method in which Moller repaid part of that money: Pikard first took up a research position at the University of California in Los Angeles; next, he got his research funded through a Russian associate in the university, one Viatchelav Kolesnikov. But the 'donated fund' actually came through Moller — from Pikard's own money the Icelander had earlier laundered to Russia.

Newsline has learnt that Kolesnikov received money from entities controlled by Wathne in Estonia and other places between 1998 and 2005; he thereafter made 'donations' to fund Pikard's research.

Money laundering is considered a serious offence in the US; if charges against Moller are proved he could get be sentenced up to 20 years in jail, police officials said. At the time of his arrest at IGI, Moller, born in Iceland's capital Reykjavik, was carrying a handbag, a cellphone, credit cards, a Rolex watch, two driving licences, and two student's identity cards.

Moller has applied for bail in a Patiala House court. His plea will be heard on Friday.

Money laundering is the practice of engaging in specific financial transactions in order to conceal the identity, source, and/or destination of money.

Rob Todd
Todd Law Firm
4265 San Felipe, Suite 605
Houston, TX  77027-2926
713/439-0039
713/629-1553(fax)

This e-mail is a meant for the intended recipient and is subject to the attorney-client privilege, and/or the attorney work product doctrine.  Do not copy, forward, or otherwise disseminate.  If you have received this e-mail in error, please inform the sender of this.

2

# EXHIBIT F

## Esther Malamud

**From:** Rob Todd [robtodd@usa.net]
**Sent:** Tuesday, October 23, 2007 12:44 PM
**To:** Esther Malamud; Rob Todd
**Subject:** RE: VALERIE SAROFIM

I'm available all day except for 3:00-4:00 CDT and 5:30-7:00 CDT.

Rob

------ Original Message ------
**Received:** Tue, 23 Oct 2007 11:33:03 AM CDT
**From:** "Esther Malamud" <esther.malamud@wathne.com>
**To:** "Rob Todd" <robtodd@usa.net>
**Subject:** RE: VALERIE SAROFIM

I am on a conference call at the moment. I do not work on Mondays and that is why you did not hear from me yesterday. Just so you know, the funds that your client invested were wired directly into the Wathne's personal account and had nothing to do with any of their companies. I will call you later today to discuss.

------
**From:** Rob Todd [mailto:robtodd@usa.net]
**Sent:** Tuesday, October 23, 2007 12:29 PM
**To:** Esther Malamud
**Subject:** VALERIE SAROFIM

Esther--

I left you a message yesterday to follow up on our conversation from October 18, 2007. During that conversation, and in response to your clients' offer to return the $150,000.00 my client had wired to the Wathne Corp, I indicated that Ms. Sarofim would entertain an offer of $150,000.00, plus pre-judgement interest at 6% per annum, plus legal fees of 10% of the total. I have not heard back from you since Thursday. I forgot to mention this, but as part of that offer, my client will execute a mutual release between herself and the Wathne Corporation.

My client remains very concerned that her money was used without her knowlege as part of a drug related, money laundering operation. I was glad to hear from you on Thursday that the money had indeed been invested in a real estate investment fund (although it is US based rather than in Russia as my client had been told). During our teleconference, I orally asked for this information, please consider this email a formal request for an accounting of said real estate investments so that I can ascertain whether it is more in my client's interest to participate in said venture. I would also like to formalize her shares in such venture. Please also forward me the corporate information on whatever entity is operating the venture.

I would greatly appreciate this information by the close of business tomorrow. You may call me on my office line (713 439 0039) at any time, and that line automatically forwards to my cell phone if when I am out of the office. My instructions are to promptly proceed with this matter if we cannot resolve it amicably and privately.

RT

Rob Todd
Todd Law Firm
4265 San Felipe, Suite 605
Houston, TX  77027-2926
713/439-0039
713/629-1553(fax)

This e-mail is a meant for the intended recipient and is subject to the attorney-client privilege,
and/or the attorney work product doctrine.  Do not copy, forward, or otherwise disseminate.  If you
have received this e-mail in error, please inform the sender of this.

# EXHIBIT G

# TLF

## TODD LAW FIRM

4265 SAN FELIPE, SUITE 606 • HOUSTON, TEXAS 77027
(713) 439-0039 • FAX (713) 629.1553

---

### FAX COVER SHEET

---

FAX NUMBER TRANSMITTED TO: 212 489 4829

| | |
|---|---|
| TO: | **ESTHER MALAMUD** |
| OF: | WATHNE CORP |
| FROM: | ROB TODD |
| CLIENT/MATTER: | VALERIE SAROFIM |
| DATE: | OCTOBER 24 2007 |

| DOCUMENTS | NUMBER OF PAGES |
|---|---|
| RELEASE | 3 |
| WIRING INSTRUCTIONS | 1 |
| | |
| | |

COMMENTS:

Esther—The following is an executed release from Ms. Sarofim and wiring instructions. The release assumes the parties will split legal fees. Please circulate this to the parties and return fax to me. Fax signatures are acceptable with me if they are with you as originals.

RT

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS PROTECTED UNDER STATE AND FEDERAL LAW BY THE ATTORNEY CLIENT PRIVILEGE AND/OR THE ATTORNEY WORK PRODUCT DOCTRINE AND IS OF AN URGENT MATTER. IF YOU ARE NOT THE INTENDED RECIPIENT OF THIS TRANSMISSION, YOU ARE REQUESTED TO CONTACT THE SENDER AT 713.439.0039 AND TO DESTROY THE CONTENTS HEREIN IMMEDIATELY.

## MUTUAL RELEASE OF CLAIMS

THE STATE OF TEXAS

COUNTY OF HARRIS

§
§
§
§
§

      This Settlement Agreement and Mutual Release of Claims ("Agreement") is made by and among Valerie Sarofim, Thorunn Wathne, Bergljot Wathne, and Soffia Wathne, and any company or entity in which any of the individual Parties to this agreement have an equitable or beneficial ownership interest (collectively the "Parties").

### INTRODUCTION

      WHEREAS, the Parties desire to resolve all matters of dispute between them relating to Valerie Sarofim's January 28, 2002 wiring of $150,000.00 to a bank account specified on Wathne Corporation letterhead dated January 28, 2002, and desire to forever discharge and release any claims which the Parties to this agreement may have against each other with respect to same.

      NOW, THEREFORE, we the undersigned, the Parties, in consideration of the aforesaid premises, mutual covenants, agreements, acknowledgments, conditions and representations hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, do hereby agree as follows:

### TERMS OF COMPROMISE

THE PARTIES HAVE AGREED AS FOLLOWS:

      The Parties each acknowledges and agrees that they have received adequate consideration for the covenants and obligations of each other contained in this Agreement.

1.    Thorunn Wathne, Bergljot Wathne, and/or Soffia Wathne shall pay, via wire transfer, to Valerie Sarofim the sum of $209,783.81, and an additional sum of $10,489.19, on or before 5:00 p.m., CST, on October 28, 2007.

### MUTUAL RELEASE OF CLAIMS

2.    For and in consideration of the mutual covenants recited herein, the Parties do hereby for themselves, hereby remise, give up, quitclaim, settle, compromise, fully release, and forever discharge each other, from all rights, demands, claims,

VS          TW____          BW____         SW____

10-23-2007 23:55   OFFICE 7136291553
10-23-2007 22:43   OFFICE 7136291553

PAGE3
PAGE3

obligations, causes of action, suits, controversies, debts, dues, sums of money, accounts, variances, trespasses, extents, privileges, covenants, contracts, agreements, promises, judgments, damages, executions, and/or any other claim at law or in equity, whether or not well founded in law or fact, which may be in existence as of the date of execution of this agreement.

8.    The Parties expressly warrant to each other that no claims, demands, controversies, actions, causes of action, liabilities, damages, injuries, loss or other rights which are mentioned in this Agreement, have been assigned, conveyed or any manner whatsoever transferred to any person or entity.

## MISCELLANEOUS

9.    The Parties expressly understand and agree that they have carefully reviewed this Agreement, that they understand its terms, that they sought legal advice with respect to this Agreement, and that the Parties have relied wholly upon their own judgment and knowledge and have not been influenced or pressured to any extent whatsoever in making this Agreement by any representations or statements made by the other or anyone acting on behalf of the other.

10    The aforesaid consideration stated herein is contractual and not a mere recital.

11    All agreements and understandings between the Parties are embodied and expressed herein and this Agreement states the entire agreement of the Parties hereto and supersedes all prior and contemporaneous negotiations and agreements, oral or written.


TW___          BW___          SW___


10-23-2007 23:32   OFFICE 7136291553

PAGE3

12.    If any provision of this Agreement is or may be held by a Court of competent jurisdiction to be invalid, void, or unenforceable, the remaining provisions shall nevertheless survive and continue in full force and effect without being impaired or invalidated in any way.

13.    This Agreement shall be governed by the laws of the United States of America and the State of Texas.  The performance of this Agreement shall be in Harris County, Texas.

14.    Nothing herein shall be construed as a release, estoppel or bar to the enforceability of the covenants and future performances of the Parties described or required in this Agreement.

IN WITNESS WHEREOF, that we have executed this instrument on the dates set forth herein below.

BY:  VALERIE SAROFIM

DATE 10/24/07

BY: THORUNN WATHNE

DATE:_____


BY:   BERGLJOT WATHNE                    BY:  SOFFIA WATHNE


TW____        BW____        SW___

10-23-2007 23:56    OFFICE 7136291553

PAGES

## MORGAN STANLEY
## INCOMING WIRE TRANSFER INSTRUCTIONS

BANK:                              Citibank, New York
ABA:                              021000089
FOR BENEFIT OF:                    Morgan Stanley
BENEFICIARY ACCT:                  40611172
FOR FURTHER CREDIT TO:    Valerie Sarofim
ACCOUNT NUMBER:    322-113451-079

**Bank ID:** 021000021    **Account:** USD 114640785    **Acct Name:** WATHNE IMPORTS LTD.

| | | |
|---|---|---|
| **Tran Type:** PAYMENT | **Confirmation No:** 1002900299JO0000 | **Pay Method:** FED |
| **Drawdown Ind:** | | |
| **Operator ID:** G4602293 | **Clearing Ref:** 0313006/0056374 | **Value Date:** 10/26/2007 |
| **Tran ID:** 13254754 | | **Status:** Released |

**Amount:** USD 209,783.81

| | |
|---|---|
| **Cust Ref:** | **Beneficiary is a Bank:** No |
| **Bene Ref:** | **JPMorgan Chgs:** Remitter |
| **By Order:** | **Ultimate Bene:** 40611172 |
| **Name:** | **Name:** MORGAN STANLEY |
| **Address:** | **Address:** |

| | |
|---|---|
| **Bene Bank:** 021000089 | **Intermediary:** |
| **Name:** CITIBANK | **Name:** |
| **Address:** 111 WALL ST,NEW YORK,NEW YORK | **Address:** |
| UNITED STATES | |

| | |
|---|---|
| **Bank Info:** | **Payment Detail:** FOR FURTHER CREDIT TO: |
| | VALERIE SAROFIM |
| | ACCT #: 322-113451-079 |

# EXHIBIT H

# TLF

## TODD LAW FIRM

4265 SAN FELIPE, SUITE 609 • HOUSTON, TEXAS 77027
(713) 439-0039 • FAX (713) 629.1553

### FAX COVER SHEET

FAX NUMBER TRANSMITTED TO: 212 489 4829

To:        **WAYNE BERGLOT/STEFAN WATHNE**

        **C/O ESTHER MALAMUD**

OF:        WATHNE CORP
FROM:      ROB TODD
CLIENT/MATTER: VALERIE SAROFIM
DATE:      JANUARY 11, 2008

| DOCUMENTS | | | NUMBER OF PAGES | |
|---|---|---|---|---|
| LETTER | | | 1 | |
| COMPLAINT | | | 5 | |
| EXHIBITS & ARTICLE | | | 12 | |

COMMENTS:

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS
PROTECTED UNDER STATE AND FEDERAL LAW BY THE ATTORNEY
CLIENT PRIVILEGE AND/OR THE ATTORNEY WORK PRODUCT
DOCTRINE AND IS OF AN URGENT MATTER.  IF YOU ARE NOT THE
INTENDED RECIPIENT OF THIS TRANSMISSION, YOU ARE
REQUESTED TO CONTACT THE SENDER AT 713.439.0039 AND TO
DESTROY THE CONTENTS HEREIN IMMEDIATELY.



**ROB TODD**
ATTORNEY AT LAW
TODD LAW FIRM
*4265 San Felipe, Suite 605 • Houston, Texas 77027*
*(713) 439.0039 • Fax (713)629-1553*

January 11, 2008                         Via Facimile No. 212 489 4829
Mr. Wayne Bergljot,
Chief Executive Officer
Wathne Corporation
156 W. 56th St.
New York, NY 10019

Mr. Stefan Wathne
Wathne Corporation
156 W. 56th Street
New York, NY 10019

*RE: VALERIE SAROFIM*

Dear Mssrs. Bergljot & Wathne:

As thirty days have passed since my initial demand letter without a complete resolution, I am providing you with a courtesy copy of the complaint my client has instructed me to file next week if we are unable to resolve this matter as anticipated.

Enclosed you will find my client's complaint, exhibits thereto, and an article on Ponzi Schemes. By this letter, I am setting the close of business, 5:00 CDT, on January 15, 2008, as the deadline to resolve this matter before further legal action is taken. Resolution of this matter will require that my client be compensated for all actual damages, interest and legal fees and an amount approximating your exposure for punitive damages. Actual damages include my clients "benefit of the bargain" which warrants an award equal to that which she was promised. This equates to a doubling or tripling of my client's initial investment (per quarter) from the date of her wire through the present date.

Please also note that at the expiration of 60 days from December 12, 2006, my client also intends to file suit for a violation of the Texas Deceptive Trade Practices Act (DTPA) as described more fully in my letter from that date

Cordially,

Rob Todd

RPT/aa

Enclosures

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **VALERIE SAROFIM** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | **CIVIL ACTION NO.** _____ |
| **STEFAN WATHNE, AND THE** | § | |
| **WATHNE CORPORATION,** | § | |
| | § | |
| **Defendants** | § | |

## COMPLAINT

TO THE HONORABLE UNITED STATES JUDGE:

The Complaint of Plaintiff, Valerie Sarofim, ("Plaintiff"), respectfully complains of

STEFAN WATHNE, AND THE WATHNE CORPORATION and for cause of action would show

the following:

### PARTIES AND SERVICE

1. Plaintiff, Valerie Sarofim is an individual doing business and residing in Harris County, Texas.

2. Defendant, Wathne Corporation is a foreign corporation located in New York City, New York. Defendant may be served at it's corporate address by serving it's Chief Executive Officer Wayne Bergljot at 156 W. 56th Street, New York, New York, 10019.

3. Defendant, Stefan Wathne, is an individual who is a resident of New York State who may be served with process at his place of business at the Wathne Corporation, located at 156 W. 56th Street, New York, New York, 10019. This Defendant has sufficient minimum contacts within the State of Texas to justify jurisdiction.

### JURISDICTION

4. Jurisdiction of this cause of action is based on Diversity.

-1-

01-11-2008 01:16   OFFICE 7136291553                                    PAGE4

## VENUE

5.      Venue is proper before this Court pursuant to 28 U.S.C. § 1391(a)(2) in that a
substantial amount of the events giving rise to this claim occurred in this district.

## FACTS

6.      This proceeding relates to a commercial relationship between the parties.  In the Fall
        of 2001, the Defendant, Wathne Corporation, by and through Defendant, Stefan
        Wathne, approached the Plaintiff with a business offer to invest in Russian Real
        Estate. Defendant, Stefan Wathne, promised Plaintiff that her investment was
        expected to double in value every two months.  On or about January 28, 2002, the
        Defendants requested, on Wathne Corporation letterhead, that the Plaintiff wire the
        Defendants the sum of One Hundred Fifty Thousand Dollars ($150,000.00) and
        included wiring instructions thereon.  See Exhibit "A" hereto.

7.      Pursuant to the agreement of the Parties to invest in Russian Real Estate, the Plaintiff
        did in fact wire the sum of $150,000.00 to the Defendants on or about January 28,
        2002. The Plaintiff periodically was reassured that her investment was going well and
        that her money had indeed doubled, then tripled, and so on.  From the time period that
        the money was invested to the date that the Plaintiff learned of the crime,
        approximately nineteen quarters passed during which the funds supposedly doubled
        or tripled in value.  This represents the maximum benefit of the bargain.

8.      On or about September 15, 2006, a sealed indictment was issued for Stefan Wathne
        alleging that he had violated the laws of this country in engaging in money laundering
        the proceeds of drug transactions.  Plaintiff was unaware of this indictment until a
        later date. A true and correct copy of said indictment is attached to this Complaint as

exhibit "B".

9.    On or about October 4, 2007, the Plaintiff learned that she may have been the victim
of a scam. On that date, she was sent an article from the Indian Times reporting that
Stefan Wathne had been arrested in New Dehli on a fugitive warrant out of the
District Court for the Southern District of California and was wanted in the United
States for money laundering. Attached to this Complaint as Exhibit "C" is a copy of
said article. Defendant, Wathne Corporation, by and through it's agent, Esther
Malamud, subsequently reassured the Plaintiff that the investment was real and that
the Wathne Corporation had not been able to complete financial documents showing
the state of the return on investment.

10.    On information and belief, the Defendant, Wathne Corporation is not registered to do
business in the State of Texas. Accordingly, the corporate veil does not exist. It is
anticipated that the shareholders of the Wathne Corporation will be added as
individual parties as soon as their identity is learned through discovery in this cause.
Additionally, on information and belief, Stephan Wathne was acting at all times both
individually and/or with the apparent authority of the Wathne Corporation. In this
capacity, both Stephan Wathne, the Wathne Corporation, and it's shareholders are
jointly and severally liable for the damages to your Plaintiff.

11.    On information and belief, the Defendants' course of conduct amounts to a Ponzi
Scheme.

## CAUSES OF ACTION

12.    Fraud: The Defendants intended to defraud the Plaintiff out of money as part of ponzi
scheme. Defendant, Stephan Wathne, promised and reassured your Plaintiff on

-3-

multiple occasions that her investment has doubled, then tripled, then doubled and tripled again. Defendant, Wathne Corporation, assisted in this scheme by allowing their name to be used in official documents soliciting the Plaintiff's money and by making statements designed to cover up the crime. As result of this conduct, your Plaintiff was damaged in the amount of $150,000.00, plus the promised benefit of the bargain, plus interest. In light of the heinous nature of this crime, your Plaintiff requests that she be awarded punitive damages in an amount of sufficient to punish your Defendants for their crime, and/or in amount equal to the gain that he promised he had reaped for the Plaintiff.

13.    Civil Rico: The foregoing statements of facts and causes of action are incorporated herein. Alternatively and without waiving the foregoing, your Defendants worked together in a concerted effort to defraud the Plaintiff in interstate and international commerce in an effort to bilk the Plaintiff out of her money. Plaintiff requests that she be awarded her actual damages of $150,000.00, plus interest, and punitive damages sufficient to punish your defendants for their crime.

14.    Breach of Contract: The foregoing statements of facts and causes of action are incorporated herein. Alternatively, and without waiving the foregoing, your Defendants promised to the Plaintiff that she her investment would be reap a return equal to a doubling or tripling of her initial investment over a period of nineteen quarters. This promise was not kept. As a result of this breach, your Plaintiff was damaged in the amount of $150,000.00, plus benefit of the bargain damages, plus interest and legal fees

-4-

## ATTORNEY'S FEES

15.   In accordance with 11 U.S.C. § 546 and the provisions of the Texas Civil Practice and Remedies Code, Plaintiff is entitled to and prays for the recovery of his reasonable attorney's fees.

16.   All conditions precedent have been performed or have occurred.

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays as follows:

a.   for judgment against the Defendant in the amount of at least $150,000.00 representing her out of pocket costs, plus pre and post judgement interest.

b.   for judgement against the Defendants in the amount in excess of the jurisdictional limits of this court plus pre and post judgment interest, representing the benefit of the bargain promised by the Defendants;

c.   that this court award punitive damages in amount sufficient to punish the Defendants for their course of action;

d.   attorney's fees;

e.   costs of court; and

f.   for such other and further relief as this Court deems to be just, proper and equitable.

Respectfully submitted,

Rob Todd
State Bar No. 20098900
4265 San Felipe, Suite 605
Houston, Texas 77027
Phone: (713) 439-0039
Fax: (713) 629-1553

-5-

# EXHIBIT A

01-11-2008 01:17    OFFICE 7136291553                                    PAGE8

Watline                    1/  '02 11:02  PAGE  1/1   R18' 'FAX       Vc

**Watline**             Watline          Fax
                                         HMC

# Facsimile

To:       Vickie Bull
@Fax:     713 244-0346
From:     Lars Fowre
Date:     Monday, January 28, 2002 @ 10:04AM
Re:       Wire info for Staten Watline
Pages:    1, including this

To follow are the wire instructions for the transfer from Vickie Serafina to Staten Watline:

> **Bank of New York**
> ABA #: 021000018
> Account Title: Sorge, Thorne, Soffe Watline
> Account #: 0991304666

Please call me at (212) 707 9797 to confirm that the wire has been completed. I apologize

TCW 199

01-11-2008 01:18   OFFICE 7136291553                                    PAGE9
OCT. 4. 2007  2:47PM   CAMBELL BARRIVON

Dear Jicki,

As per our discussion
this is to confirm that
I want $150,000 transfered
from my core account
to the Wathne Corp.
Acct # 114-640742.
Thank you and have a nice
weekend.

Valerie Sloan

TGW 183

# EXHIBIT B



# United States District Court

FOR THE
NORTHERN DISTRICT OF CALIFORNIA
CRIMINAL DIVISION
VENUE: SAN FRANCISCO

FILED
05 SEP 15 PM 2: 34
RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

# CR 05 00594 VRW

STEFAN WATHNE,
a/k/a Gunner Stefan Moller

DEFENDANT.

## INDICTMENT

18 U.S.C. § 1956 (h) - Conspiracy to Commit Money Laundering

A true bill.

Foreman

Filed in open court this 15th day of
Sept 2005

KAREN L. HOM
Clerk

EDWARD M. CHEN

No Bail            Bail, $

AO 257 (Rev. 6/78)

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☐ COMPLAINT  ☐ INFORMATION  ☒ INDICTMENT
☐ SUPERSEDING

### OFFENSE CHARGED

Conspiracy to commit money laundering, in violation of 18 U.S.C. §1956(h)

☐ Petty
☐ Minor
☐ Misde-meanor
☒ Felony

PENALTY:
20 years in prison; a fine of $500,000 or twice the value of the monetary instrument or funds involved in the transaction, whichever is greater; 3 years supervised release; $100 special assessment

### PROCEEDING

Name of Complaintant Agency, or Person (&Title, if any)

DEA

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrP 20, 21 or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. Atty  ☐ Defense

☐ this prosecution relates to a pending case involving this same defendant

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

Name and Office of Person
Furnishing Information on
THIS FORM        KEVIN V. RYAN
☒ U.S. Atty  ☐ Other U.S. Agency

Name of Asst. U.S. Atty
(if assigned)        CHRISTOPHER STESKAL

Name of District Court, and/or Judge/Magistrate Location
NORTHERN DISTRICT OF CALIFORNIA

FILED

05 SEP 15 PM 2:24
RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NO. DIST. OF CALIFORNIA

DEFENDANT - U.S.

▶ Stefan WATHNE, aka Gunnar Stefan Moller

DISTRICT COURT NUMBER

# CR 05 00594

VRW

### DEFENDANT

IS **NOT** IN CUSTODY
1) ☐ Has not been arrested, pending outcome this proceeding. If not detained give date any prior summons was served on above charges
2) ☒ Is a Fugitive
3) ☐ Is on Bail or Release from (show District)

IS IN CUSTODY
4) ☐ On this charge
5) ☐ On another conviction
6) ☐ Awaiting trial on other charges        ☐ Fed'l  ☐ State
If answer to (6) is "Yes", show name of institution

Has detainer
been filed?   ☐ Yes   If "Yes" give date filed
              ☐ No

DATE OF ARREST        Month/Day/Year

Or... if Arresting Agency & Warrant were not

DATE TRANSFERRED        Month/Day/Year
TO U.S. CUSTODY

☐ This report amends AO 257 previously submitted

### ADDITIONAL INFORMATION OR COMMENTS

PROCESS:
☐ SUMMONS  ☐ NO PROCESS*  ☒ WARRANT   Bail Amount:  No Bail

If Summons, complete following:
☐ Arraignment  ☐ Initial Appearance
Defendant Address:

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

Date/Time:

Before Judge:

Comments:

1  KEVIN V. RYAN (CSBN 118321)
   United States Attorney
2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                     SAN FRANCISCO DIVISION                       VRW

11  UNITED STATES OF AMERICA,    CR  05   00594

12       Plaintiff,                    VIOLATIONS: 18 U.S.C. § 1956(h) ~
                                       Conspiracy to Commit Money Laundering
13       v.

14  STEFAN WATHNE,                      SAN FRANCISCO VENUE
    a/k/a, Gunner Stefan Moller,
15

16       Defendant.                     (UNDER SEAL)

17

18                        I N D I C T M E N T

19  The Grand Jury charges:

20        On or about and between the spring of 1996 and November 2000, both dates being

21  approximate and inclusive, in the Northern District of California, and elsewhere, the defendant

22                         STEFAN WATHNE,
                        a/k/a, Gunner Stefan Moller,
23

24  together with William Leonard Pickard and others, did knowingly and intentionally conspire to

25  conduct and attempt to conduct financial transactions affecting interstate and foreign commerce,

26  which transactions involved the proceeds of specified unlawful activity, to wit: the manufacture

27  and distribution of lysergic acid diethylamide ("LSD"), a Schedule I controlled substance, in

28  violation of 21 U.S.C. §§ 841(a)(1) and 846, knowing that the transactions were designed in



FILED
05 SEP 15 PM 2:35
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1  whole or in part to conceal and disguise the nature, location, source, ownership, and control of

2  the proceeds of the specified unlawful activity, and that while conducting and attempting to

3  conduct such financial transactions knew that the property involved in the financial transactions

4  represented the proceeds of some form of unlawful activity, in violation of 18 U.S.C.

5  § 1956(a)(1)(B)(i).

6        All in violation of Title 18, United States Code, Section 1956(h).

7                    FORFEITURE ALLEGATION (18 U.S.C. § 982)

8        The Grand Jury further charges that:

9        The allegations contained above are hereby realleged and by this reference fully

10  incorporated herein for the purpose of alleging forfeitures pursuant to the provisions of Title 18,

11  United States Code, Section 982(a)(1).

12        As a result of the offense alleged above, STEFAN WATHNE shall forfeit to the United

13  States all property, real and personal, involved in such offense, or any property traceable to such

14  property, constituting the laundered proceeds of the specified unlawful activity set forth above.

15        By virtue of the commission of the felony offense charged in this indictment by STEFAN

16  WATHNE, any and all interest that STEFAN WATHNE has in the above-described property is

17  vested in the United States and is hereby forfeited to the United States pursuant to Title 18,

18  United States Code, Section 982(a)(1).

19        If any of the property described herein as being subject to forfeiture, as a result of any act

20  or omission of the defendant-

21        (1) cannot be located upon the exercise of due diligence;

22        (2) has been transferred or sold to or deposited with, a third person;

23        (3) has been placed beyond the jurisdiction of the Court;

24        (4) has been substantially diminished in value; or

25        (5) has been commingled with other property which cannot be subdivided without

26  difficulty; any and all interest STEFAN WATHNE has in other property shall be vested in the

27  ///

28  ///

INDICTMENT                                  2

1    United States and forfeited to the United States pursuant to Title 18, United States Code, Section

2    982(b)(1), up to approximately $3,000,000.

3

4    DATED:    9/15/05                              A TRUE BILL.

5

6                                                  FOREPERSON

7    KEVIN V. RYAN
     United States Attorney

8

9

10   EUMI CHOI
     Chief, Criminal Division

11

12   (Approved as to form:
                              AUSA STESKAL

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

     INDICTMENT                           3

# EXHIBIT C

01-11-2008 01:19   OFFICE 7136291553                                      PAGE15
indianexpress.com :  Wanted for money laundering in US, Iceland man held at IGI   Page 1 of 1



*The Indian* **EXPRESS**                                            Print Story

Wanted for money laundering in US, Iceland man held at IGI

Amandeep Shukla

*Posted online: Thursday, September 27, 2007 at 0000 hrs IST*

New Delhi, September 26
An Iceland national wanted for the past at least four years by the United States for money laundering has landed in the Delhi Police's net at the Indira Gandhi International Airport.

Gunnar Stefan Moller, also known as Wathe Stefan, carries a "red corner notice" issued by US investigative agencies for evading arrest and escaping the country. The IGIA police arrested him on Friday.

Police sources said a US district court in North Carolina had issued a warrant against Moller in September 15, 2005.

Sources said charges against Moller date back to April 1, 2003, when a US court in Kansas convicted one William Pikard for manufacturing banned LSD drug (Lysergic Acid Diethylamide). According to US authorities, Moller helped Pikard launder his ill-gotten money by investing it in Russia. US authorities estimate Moller had laundered as much as US\$ 3 million for Pikard in Russia.

Newsline has learnt the method in which Moller repaid part of that money: Pikard first took up a research position at the University of California in Los Angeles; next, he got his research funded through a Russian associate in the university, one Viatchelav Kolesnikov. But the 'donated fund' actually came through Moller -- from Pikard's own money the Icelander had earlier laundered to Russia.

Newsline has learnt that Kolesnikov received money from entities controlled by Wathne in Estonia and other places between 1998 and 2005; he thereafter made 'donations' to fund Pikard's research.

Money laundering is considered a serious offence in the US; if charges against Moller are proved he could get be sentenced up to 20 years in jail, police officials said. At the time of his arrest at IGI, Moller, born in Iceland's capital Reykjavik, was carrying a handbag, a cellphone, credit cards, a Rolex watch, two driving licences, and two student's identity cards.

Moller has applied for bail in a Patiala House court. His plea will be heard on Friday.

Money laundering is the practice of engaging in specific financial transactions in order to conceal the identity, source, and/or destination of money.

http://www.indianexpress.com/printerFriendly/221561.html                    10/4/2007

01-11-2008  01:19    OFFICE 7136291553                                    PAGE16
Charles Ponzi - Wikipedia, the free encyclopedia                        Page 1 of 5

# Charles Ponzi

From Wikipedia, the free encyclopedia

**Charles Ponzi** (March 3, 1882–January 18, 1949) was an Italian immigrant to the United States who became one of the greatest swindlers in American history. His aliases include **Charles Ponei, Charles P. Bianchi, Carl** and **Carlo**. Although many people have never heard of Ponzi himself, the term "Ponzi scheme" is a widely known description of a system of fraudulent "make money fast" schemes promoted through the Internet and elsewhere to this day.



| Charles Ponzi | |
|---|---|
| 1920 mugshot of Ponzi | |
| **Born** | March 3, 1882 |
| | Lugo, Italy |
| **Died** | January 18, 1949 (aged 66) |
| | Rio de Janeiro, Brazil |
| **Conviction(s)** | Mail fraud |
| **Penalty** | 5 years (federal, served 3 and half years before facing state charge) and 9 years (state) |
| **Status** | Deceased |
| **Occupation** | Businessman |
| **Spouse** | Rose Gnecco |

## Contents

- 1 Early life
- 2 Arrival in America
- 3 The Ponzi scheme
- 4 Suspicion
- 5 Collapse
- 6 Prison and later life
- 7 References

## Early life

Parts of Charles Ponzi's life are somewhat difficult to determine, due to his propensity to fabricate and embellish facts. He was born Carlo Ponzi in Lugo, Italy in 1882 (not Parma as some accounts hold, although he resided there as a teenager). He took a job as a postal worker early on, but soon was accepted into the University of Rome La Sapienza. His friends considered the university a "four-year vacation", and he was inclined to follow them around to bars, cafés, and the opera. At some point, short on funds, Ponzi dropped out of university and boarded the *S.S. Vancouver* bound for Boston, Massachusetts, USA.

## Arrival in America

By his own account, Ponzi arrived in the United States in 1903 with two dollars and fifty cents in his pocket, having gambled away the rest of his life savings during the voyage. He quickly learned English and spent the next few years doing odd jobs along the East Coast, eventually taking a job as a dishwasher in a restaurant, where he slept on the floor. He managed to work his way up to the position of waiter, but was fired for shortchanging the customers and theft.

In 1907 Ponzi moved to Montreal, Canada, and became an assistant teller in the newly opened *Banco Zarossi*, a bank started by Luigi "Louis" Zarossi to service the influx of Italian immigrants arriving in the city. Zarossi paid 6% interest, double the going rate, on bank accounts, and was growing rapidly as a result. Ponzi found out that the bank was in serious financial trouble because of bad real estate loans, and

01-11-2008 01:20   OFFICE 7136291953

Charles Ponzi - Wikipedia, the free encyclopedia

that Zarossi was funding the interest payments not through profit on investments, but by using money deposited in newly opened accounts. The bank eventually failed and Zarossi fled to Mexico with a large portion of the bank's money.

Ponzi stayed in Montreal and, for some time, lived at Zarossi's house helping the man's abandoned family while planning to return to the United States and start over. As Ponzi was penniless, this proved to be very difficult. Eventually he walked into the offices of a former Zarossi customer and, finding no one there, wrote himself a check for $423.58 in a checkbook he found, forging the signature of a director of the company. Confronted by police who had taken note of his large expenditures just after the forged check was cashed, Ponzi held out his hands wrist up and said "I'm guilty." He ended up spending three years in a Quebec prison as Inmate # 6660. Rather than inform his mother of this development, he posted her a letter stating that he had found a job as a "special assistant" to a prison warden.

After his release in 1911 he decided to return to the United States, but got involved in a scheme to smuggle Italian illegal immigrations across the border. He was caught and spent two years in an Atlanta prison. Here he became a translator for the warden, who was intercepting letters from a famous mobster, Ignazio "the Wolf" Lupo. Ponzi ended up befriending Lupo, but it was another prisoner who became a true role model to Ponzi; Charles Morse convinced doctors he was dying by eating soap shavings, and was released early.

## The Ponzi scheme

When Ponzi was released he eventually made his way back to Boston. There he met an Italian girl, Rose Gnecco, who was swept off her feet by Ponzi's charm. Though Ponzi did not tell Gnecco about his years in jail, his mother sent Gnecco a letter telling her of Ponzi's past, but she remained with him, marrying in 1918. For the next few months he worked at a number of businesses, before hitting upon an idea to sell advertising in a large business listing to be sent to various businesses, an idea which others would later, independently, invent as the Yellow Pages. Ponzi, unfortunately, was unable to sell this idea to businesses, and his company failed soon after.

A few weeks later Ponzi received a letter in the mail from a company in Spain asking about the catalog. Inside the envelope was an international postal reply coupon (IRC), something which he had never seen before. He asked about it and found a weakness in the system which would in principle allow him to make money.

The purpose of the postal reply coupon was to allow someone in one country to send it to a correspondent in another country, who could use it to pay the postage of a reply. For use within the same country, postage stamps would be sent: but stamps issued by one country cannot be used in another. IRCs were priced at the cost of postage in the country of purchase, but could be exchanged for stamps to cover the cost of postage in the country where redeemed; if these values were different, there was a potential profit. Inflation after the First World War had much decreased the cost of postage in Italy expressed in U.S. dollars, so that an IRC could be bought cheaply in Italy and exchanged for U.S. stamps to a higher value. The process was: send money abroad; have IRCs purchased by agents; send the IRCs to the U.S.A.; redeem the IRCs for stamps to a higher value; sell the stamps. Ponzi claimed that the net profit on these transactions, after expenses and exchange rates, was in excess of 400%. This was a form of arbitrage, or buying low and selling high, which is not illegal.

Ponzi canvassed friends and associates to back his scheme, offering a 50% return on investment in 45

http://en.wikipedia.org/wiki/Charles_Ponzi

days. The great returns available from postal reply coupons, he explained to them, made such incredible profits easy. He started his own company, the Securities Exchange Company, to promote the scheme.

Some people invested, and were paid off as promised. The word spread, and investment came in at an ever-increasing rate. Ponzi hired agents and paid them generous commissions for every dollar they brought in. By February 1920, Ponzi's total take was $5,000 USD, a large sum for the time.

By March he had made $30,000. A frenzy was building, and Ponzi began to hire agents to take in money from all over New England and New Jersey. At that time investors were being paid impressive rates, encouraging yet others to invest.

By May 1920 he had made $420,000. He began depositing the money in the Hanover Trust Bank, in hopes that once his account was large enough he could impose his will on the bank or even be made its president; he did, in fact, get a controlling interest in the bank.

By July 1920 he had made millions. People were mortgaging their homes and investing their life savings. Most did not take their profits, but reinvested.

Ponzi was bringing in cash at a fantastic rate, but the simplest financial analysis would have shown that the operation was running at a large loss. As long as money kept flowing in, existing investors could be paid with the new money, but colossal liabilities were accumulating.

Ponzi lived luxuriously: he bought a mansion with air conditioning and a heated swimming pool, and brought his mother from Italy in a first-class stateroom on an ocean liner. He was a hero among the Italian community, and was cheered wherever he went.

## Suspicion

There were signs of Ponzi's eventual ruin: a furniture dealer who had given Ponzi furniture when he could not afford to pay, sued Ponzi to cash in on the gold rush. The lawsuit was unsuccessful, but it did start people asking how Ponzi could have gone from being penniless to being a millionaire in so short a time. There was a run on the Securities Exchange Company as some investors decided to pull out.

Ponzi paid them cheerfully and the run stopped. In fact, on July 24, 1920, the *Boston Post* printed a positive article on Ponzi and his scheme that brought in investors faster than ever. At that time, Ponzi was making $250,000 a day.

Despite this reprieve one of the editors of the *Post* was suspicious and assigned investigative reporters to check Ponzi out. He was also under investigation by the Commonwealth of Massachusetts, and on the day the *Post* printed its article Ponzi met with state officials. He managed to divert the officials from checking his books by offering to stop taking money during the investigation: a fortunate choice, as proper records were not being kept. Ponzi's offer temporarily calmed the suspicions of the state officials.

## Collapse

By this time Ponzi was seeking another deal to get him out of the golden trap he had built for himself, but time was running out. On July 26 the *Post* started a series of articles that asked hard questions about the operation of Ponzi's money machine. The *Post* contacted Clarence Barron, the financial analyst who

published the *Barron's* financial paper, to examine Ponzi's scheme. Barron observed that though Ponzi was offering fantastic returns on investments, Ponzi himself wasn't investing with his own company.

Barron then noted that to cover the investments made with the Securities Exchange Company, 160,000,000 postal reply coupons would have to be in circulation. However, only about 27,000 coupons were actually circulating. The United States Postal Service stated that postal reply coupons were not being bought in quantity at home or abroad. The gross profit margin in percent on buying and selling each IRC was colossal, but the overhead required to handle the purchase and redemption of these items, which were of extremely low cost and were sold individually, would have exceeded the gross profit.

The stories caused a panic run on the Securities Exchange Company. Ponzi paid out $2 million in three days to a wild crowd outside his office. He canvassed the crowd, passed out coffee and donuts, and cheerfully told them they had nothing to worry about. Many changed their minds and left their money with him.

There was something clueless in Ponzi's cleverness. He had set a scheme in motion that was sure to collapse sooner or later. He was pulling in a pile of cash, but only at the expense of going into even greater debt. At some point the logical move, from a criminal viewpoint, would have been to relocate to a place outside the reach of American authorities. Instead, he stayed where he was and continued to pay out. Ponzi wanted to look as honest as possible, and according to his autobiography, he was always hoping he could use the fortune he was accumulating to start a legitimate business that would make enough money to pay back all his investors and make everyone rich. Among the ideas he floated was buying a $300 million American warship and turning it into a floating shopping mall, promoting patriotism and commerce by stocking it with American goods. However, like most of Ponzi's business plans this was wild and absolutely impossible; if he ever had $300 million to spend from his out-of-control scheme, he would be that much in debt ($3 billion in 2006 dollars) before he sold a single thing from his ship.

In the short term, Ponzi had hired a publicity agent, James McMasters. However, McMasters quickly became suspicious of Ponzi's endless talk of postal reply coupons, as well as the ongoing investigation against him. He went to the *Post*, calling Ponzi a "financial idiot." The paper offered him five thousand dollars for his story, and ran a headline on August 2 declaring Ponzi hopelessly insolvent. On August 10 federal agents raided the Securities Exchange Company and shut it down. There was no large stock of postal reply coupons. The Hanover Trust Bank was shut down as well.

The *Post* continued their articles, with one revealing Ponzi's jail record and publishing his (smiling) Canadian mugshots. By August 13, Ponzi was under arrest, with a Federal indictment citing 86 counts of fraud. Ponzi's supporters were outraged at the officers who arrested him. 17,000 people had invested millions, maybe tens of millions, with Ponzi. Many who were ruined were so blinded by their faith in the man or their refusal to admit their foolishness that they still regarded him as a hero.

## Prison and later life

On November 1, 1920, Ponzi pleaded guilty to mail fraud, and was sentenced to five years in federal prison. He was released after three and a half years to face state charges. He was again found guilty and sentenced to nine years. Before entering state prison, Ponzi jumped bail and fled to Florida, where he set up a scam to sell "prime Florida property" to gullible investors. Florida authorities quickly wised to Ponzi's scam. He fled to Texas, where he shaved his head, grew a mustache, and tried to flee the country

as a crewman on a merchant ship. He was caught and sent back to Massachusetts to serve out his prison term.

In the meantime, government investigators tried to trace Ponzi's convoluted accounts to figure out how much money he had taken and where it had gone. They never did manage to untangle it, and could only conclude that millions had gone through his hands.

Ponzi was released in 1934 and was immediately deported to Italy since he never had become an American citizen. His flashy confidence had faded by that time, and when he left the prison gates he was met by an angry crowd. He told reporters before he left: "I went looking for trouble, and I found it." Rose stayed behind and later divorced him, as she did not want to leave Boston for his sake. However, they continued to exchange hopeful love letters up until Ponzi's death.

In Italy, Ponzi jumped from scheme to scheme but little came of them. He eventually got a cozy job in Brazil as an agent for Ala Littoria, the Italian state airline. However, during World War II, the Brazilians, who had sided with the Allies, realized the Italians were using the airline to ship strategic materials and shut it down.

Ponzi spent the last years of his life in poverty. He had a stroke in 1948, and died in a charity hospital in Rio de Janeiro on January 18, 1949. His life had been characterized by one great moment of glory surrounded by outlandish, wild ventures which inevitably lost him money. In the charity hospital, Ponzi granted one last interview to an American reporter, and commented about the wild ride he had given Bostonians: "Even if they never got anything for it, it was cheap at that price. Without malice aforethought I had given them the best show that was ever staged in their territory since the landing of the Pilgrims! It was easily worth fifteen million bucks to watch me put the thing over!"

# References

*The initial version of this article was based on a public domain article from Greg Goebel's Vectorsite.*

- Zuckoff, Mitchell. *Ponzi's Scheme: The True Story of a Financial Legend.* Random House: New York, 2005. (ISBN 1-4000-6039-7)
- The History Channel. "In Search of History: Mr. Ponzi and His Scheme". February 9, 2000. (AAE-42325, ASIN 0767016726)

Retrieved from "http://en.wikipedia.org/wiki/Charles_Ponzi".

Categories: Articles lacking sources from October 2007 | All articles lacking sources | Italian criminals | Fraudsters | Pyramid and Ponzi schemes | Crimes | 1882 births | 1949 deaths | White-collar criminals

- This page was last modified 18:21, 13 November 2007.
- All text is available under the terms of the GNU Free Documentation License. (See **Copyrights** for details.)
  Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a U.S. registered 501(c)(3) tax-deductible nonprofit charity.